IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
FOURTH DIVISION

| | |
|---|---|
| **AALFA Family Clinic**; **Paul J. Spencer, D.O.**; **Mary M. Paquette, M.D.**; **Matthew J. Paquette, M.D.**; **Kathleen Kobbermann, M.D.**; **Cheryl McKee, PA-C, MPAS**; **Patrick G. Spencer, FNP-C, MSN, RN**; **Matthew Anderson, M.D., OB/GYN**; **Sarah Slattery, PA-C, MPAS**; **Abigail Tierney, PA-C, MPAS**; **Peter J. Daly, M.D.**; **American Association of Pro-Life Obstetricians and Gynecologists**; **Pro-Life Action Ministries Incorporated**; **Rebecca Vavilov**; **Melanie Schumacher**; **Noel Diedrich**; **Victoria Pauling**; **James Benyon**; **Mike Fuith**; **Angie Fuith**; **Greg Schmitz**; **Paulette Kostick**; **and Jennifer Steffel**, <br><br>　　　　　　　Plaintiffs, <br><br>v. <br><br>**Tim Walz**, in his official capacity as Governor of the State of Minnesota; **Jan Malcolm**, in her official capacity as Commissioner for the Minnesota Department of Health; **Planned Parenthood North Central States**; **Whole Woman's Health of the Twin Cities LLC**; **WE Health Clinic P.A.**; **Robbinsdale Clinic**, <br><br>　　　　　　　Defendants. | Case No. _____ |

## COMPLAINT

The COVID-19 pandemic has led to a worldwide shortage of personal protective equipment, such as masks, gloves, gowns, and face shields. This is threatening the lives

of doctors and nurses on the front lines of the COVID-19 pandemic, who are already being instructed to re-use the masks and gowns that protect them and their colleagues from the highly contagious virus. It is also putting the entire American health-care system at risk of collapse. If hospitals run out of personal protective equipment and medical professionals begin falling sick and dying, then the nation will become incapable of treating those who acquire the COVID-19 virus, which will drastically increase the number of infections and lead to a loss of life of catastrophic proportions.

In response to this threatened calamity—and to conserve scarce personal protective equipment for COVID-19 first responders and others providing essential and medically necessary health care—Governor Tim Walz issued an executive order that postpones all "non-essential or elective surgeries and procedures" that use personal protective equipment (PPE). *See* Executive Order 20-9 (attached as Exhibit 2). But the State Department of Health is refusing to enforce the governor's order against abortion providers, and is giving them carte blanche to squander personal protective equipment on elective and unnecessary surgical abortions—even when medication abortion (which uses less PPE) remains available as an alternative means of aborting a pregnancy.

The COVID-19 pandemic has also led governments to impose social-distancing measures that reduce the spread of the virus and alleviate the burdens on the nation's health-care system. In an effort to enforce social distancing, Governor Walz has issued stay-at-home orders that prohibit Minnesotans from exercising their constitutional rights to peaceably assemble and attend church services. *See* Executive Order 20-20 (attached as Exhibit 4); Executive Order 20-33 (extending the stay-at-home order) (attached as Exhibit 5). Yet the Governor's orders refuse to subordinate any aspect of the

right to abortion to social-distancing requirements, and they are allowing abortion clinics to continue performing surgical abortions even though medication abortion requires less patient contact with clinic staff and less patient time at the clinic.

The State's decision to allow surgical abortions to continue when medication abortion remains available is wasting PPE and aggravating the spread of COVID-19 by undermining the State's social-distancing efforts. This is endangering the health and safety of Minnesota residents, and it is threatening the lives of COVID-19 patients and the health-care workers who treat them. And the State's decision to give special dispensations to abortion providers when other elective surgeries and fundamental constitutional rights have been suspended violates the Equal Protection Clause, by infringing fundamental rights without precisely tailoring those restrictions to the State's admittedly compelling interest in preventing the spread of COVID-19. A State may curtail the exercise of constitutional rights to prevent the spread of a deadly pandemic, but it cannot give special status to politically favored rights such as abortion when rights that actually appear in the Constitution—such as the right to the free exercise of the religion and the right of the people to peaceably assemble—are being subordinated to the State's COVID-19 prevention measures. The plaintiffs seek declaratory relief to this effect, and they seek an immediate injunction against the performance of surgical abortion when medication abortion can be used to terminate a fetus.

## JURISDICTION AND VENUE

1. The Court has subject-matter jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 28 U.S.C. § 1367.

2. Venue is proper because a substantial part of the events giving rise to the claims occurred in the district of Minnesota. *See* 28 U.S.C. § 1391(b)(2).

3. Because the claims arose in Ramsey County, assignment to the Third Division is proper.

## PARTIES

4. Plaintiff AALFA Family Clinic is an independent medical clinic located at 4465 White Bear Parkway, White Bear Lake, Ramsey County, Minnesota.

5. Plaintiffs Paul J. Spencer, D.O., Mary M. Paquette, M.D., Matthew J. Paquette, M.D., Kathleen Kobbermann, M.D., Cheryl McKee, PA-C, MPAS, Patrick G. Spencer, FNP-C, MSN, RN, Matthew Anderson, M.D., OB/GYN, Sarah Slattery, PA-C, MPAS, and Abigail Tierney, PA are medical professionals employed at AALFA Family Clinic.

6. Plaintiff Peter J. Daly, M.D., is an orthopedic surgeon who practices in St. Paul, Minnesota.

7. Plaintiff American Association of Pro-Life Obstetricians and Gynecologists (AAPLOG) is a membership organization of obstetricians and gynecologists.

8. Plaintiff Pro-Life Action Ministries, Incorporated (PLAM) is a Minnesota non-profit corporation.

9. Plaintiff Rebecca Vavilov resides in Apple Valley, Dakota County, Minnesota.

10. Plaintiff Melanie Schumacher resides in Montgomery, Le Sueur County, Minnesota.

11. Plaintiff Noel Diedrich resides in St. Paul, Ramsey County, Minnesota.

12. Plaintiff Victoria Pauling resides in New Prague, Scott County, Minnesota.

13. Plaintiff James Benyon resides in Pine Springs, Washington County, Minnesota.

14. Plaintiffs Mike and Angie Fuith reside in Stillwater, Washington County, Minnesota.

15. Plaintiff Greg Schmitz resides in St. Paul, Ramsey County, Minnesota.

16. Plaintiff Paulette Kostick resides in Ham Lake, Anoka County, Minnesota.

17. Plaintiff Jennifer Steffel resides in Inver Grove Heights, Dakota County, Minnesota.

18. Defendant Tim Walz is the governor of Minnesota. His office is in St. Paul, Minnesota. Governor Walz may be served at 130 State Capitol, 75 Reverend Dr. Martin Luther King Jr. Boulevard, St. Paul, Minnesota 55155. Governor Walz is sued in his official capacity.

19. Defendant Jan Malcolm is the Commissioner for the Minnesota Department of Health. Commissioner Malcolm may be served at 625 North Robert Street, St. Paul, Minnesota 55155-2538. Commissioner Malcolm is sued in her official capacity.

20. Defendant Planned Parenthood North Central States is an abortion provider. It has offices in St. Paul and Rochester, and it may be served either at 91 Viking Drive West, St. Paul, Minnesota 55117, or at 1212 7th Street NW, Rochester, Minnesota 55901.

21. Defendant Whole Woman's Health of the Twin Cities LLC is an abortion provider. It may be served at 825 South 8th Street #1018, Minneapolis, Minnesota 55404.

22. Defendant WE Health Clinic P.A. is an abortion provider. It may be served at 32 East 1st Street, Duluth, Minnesota 55802.

23. Defendant Robbinsdale Clinic is an abortion provider. It may be served at 3819 West Broadway Avenue, Minneapolis, Minnesota 55422.

## EXECUTIVE ORDER 20-09

24. The COVID-19 pandemic has produced a worldwide shortage of personal protective equipment (PPE), such as masks, gloves, gowns, and face shields.

25. This shortage is threatening the lives of doctors and nurses on the front lines of the pandemic, who are already being instructed to re-use the masks and gowns that are needed to protect them and their colleagues from the highly contagious virus.[1]

---

1. See Andrew Jacobs, Matt Richtel, and Mike Baker, *"At War With No Ammo": Doctors Say Shortage of Protective Gear Is Dire*, New York Times (March 19, 2020), available at https://nyti.ms/2UYZMvs; Melanie Evans and Khadeeja Safdar, *Hospitals Facing*

26. On March 13, 2020, Governor Tim Walz declared a peacetime emergency. *See* Executive Order 20-01 (attached as Exhibit 1).

27. On March 19, 2020, the governor issued Executive Order 20-09, which postpones "all non-essential or elective surgeries and procedures, including non-emergent or elective dental care, that utilize PPE or ventilators." The order suspends non-essential or elective surgeries and procedures "for the duration of the peacetime emergency declared in Executive Order 20-01 or until this Executive Order is rescinded." *See* Executive Order 20-09 (attached as Exhibit 2).

28. Executive Order 20-09 explains why Governor Walz ordered a halt to all non-essential or elective surgeries and procedures that use PPE:

> COVID-19 cases in Minnesota are rapidly increasing and risk overwhelming the healthcare system. On March 17, 2020, the Centers for Disease Control and Prevention recommended delaying elective inpatient and outpatient surgeries and procedures, which include dental procedures. On March 18, 2020, the Centers for Medicare and Medicaid Services ("CMS") issued similar guidance. CMS recognizes that conservation of critical resources such as ventilators and personal protective equipment ("PPE") is essential to aggressively address the COVID-19 pandemic. CMS has also recognized that non-emergent or elective procedures increase patient and provider contact, which could increase the risk of COVID-19 transmission. This risk provides further reason to delay elective surgeries and procedures. To ensure the health and safety of Minnesotans, it is important to establish consistency throughout our healthcare system and ensure that our resources can be focused on responding to this pandemic.

*See* Executive Order 20-09 (attached as Exhibit 2).

29. The order defines a "non-essential surgery or procedure" as:

---

*Coronavirus Are Running Out of Masks, Other Key Equipment*, Wall Street Journal (March 18, 2020), available at https://on.wsj.com/39FTPsG.

a surgery or procedure that can be delayed without undue risk to the current or future health of a patient. Examples of criteria to consider in making this determination include:

  a. Threat to the patient's life if surgery or procedure is not performed.
  b. Threat of permanent dysfunction of an extremity or organ system, including teeth and jaws.
  c. Risk of metastasis or progression of staging.

*See* Executive Order 20-09 (attached as Exhibit 2).

30. Any person who willfully violates Executive Order 20-09 is guilty of a misdemeanor, and is punishable by a fine not to exceed $1,000, or by imprisonment for not more than 90 days. *See* Executive Order 20-09 (attached as Exhibit 2).

31. Surgical abortion consumes personal protective equipment, including gloves, surgical masks, and protective eyewear.

32. Abortion providers have admitted in other lawsuits that surgical abortion consumes PPE. *See Planned Parenthood Center for Choice v. Abbott*, No. 1:20-cv-00323-LY (W.D. Tex.), Complaint (ECF No. 1) at ¶ 54 ("[C]linicians use some PPE for procedural abortion—such as gloves, a surgical mask, and protective eyewear.").

33. Medication abortions do not require the use of PPE when the drugs are distributed. It is possible that PPE will be consumed during a pre-abortion ultrasound or a post-abortion examination, and it is possible that PPE will be consumed if an examination is performed or blood is drawn before distributing the pills. But a medication abortion will still consume less PPE than a surgical abortion.

34. The language of Executive Order 20-09 prohibits surgical abortions when medication abortion could be performed on the patient instead. Surgical abortions consume PPE, and they cannot qualify as an "essential" surgery when medication abortion can be used to achieve the same result.

35. Nevertheless, the Minnesota Department of Health has decided to categorically exempt abortion providers and their patients from the requirements of Executive

Order 20-09, and the governor has "deferred" to the Department's decision. *See* Torey Van Oot, *Minnesota Providers Can Continue Abortion, Drawing Criticism From Some*, Star Tribune (March 31, 2020), available at http://strib.mn/3cfFnJP (attached as Exhibit 3).

36. The state's officials have therefore given abortion providers free rein to divert scarce PPE toward unnecessary surgical abortions, even when medication abortion could be used in an effort to conserve PPE.

## EXECUTIVE ORDERS 20-20 AND 20-33

37. The COVID-19 pandemic has led governments to impose social-distancing requirements to reduce the spread of the virus.

38. On March 25, 2020, Governor Walz issued a stay-at-home order that (among other things) prohibits Minnesotans from attending church services and exercising their constitutional right to peaceably assemble. *See* Executive Order 20-20 (attached as Exhibit 4).

39. On April 8, 2020, Governor Walz extended this stay-at-home order. *See* Executive Order 20-33 (attached as Exhibit 5).

40. The governor's orders exempt abortion clinics from social-distancing restrictions whenever their employees are performing "work duties that cannot be done at their homes or residence." *See* Executive Order 20-20(6)(a)(ii) (exempting workers who provide "reproductive health care" from the order's social-distancing requirements whenever they perform "work duties that cannot be done at their homes or residence"); Executive Order 20-33(6)(a)(ii) (same).

41. Medication abortions require less contact between the patient and clinic staff and require less patient time at the abortion clinic when compared to surgical abortions. Medication abortion, for example, does not require surgery or anesthesia. The procedure can be started in a medical office or clinic. A medication abortion can also be

done at home, though a woman would still need to visit her doctor to be sure there are no complications. *See* https://www.mayoclinic.org/tests-procedures/medical-abortion/about/pac-20394687 (last visited Apr. 13, 2020).

42. A surgical abortion removes the contents of the uterus, effectively ending a pregnancy, using different surgical means; the specific method used depends on how far along the pregnancy is. Regardless of the method, surgical abortion is an invasive procedure, and the patient requires both pre-surgical and post-operative care to make sure no complications arise. https://www.docdoc.com.sg/info/procedure/surgical-abortion (last visited Apr. 13, 2020).

43. Indeed, one of the defendant abortion clinics is "recommending" that its patients opt for medication abortion over surgical abortion "to keep with social distancing mandates." *See* https://wehealthclinic.org (last visited on April 28, 2020) (attached as Exhibit 6); *id.* ("Please seriously consider [medication abortion] as this can help keep you and our staff safer. This method requires less staff contact and less time at our clinic.").

44. Yet the WE Health Clinic and the remaining defendant abortion clinics are still performing surgical abortions for patients that request it, even with the full knowledge that this chosen method of abortion consumes extra PPE and increases the patient's contact with clinic staff and the amount of time spent at the clinic.

45. And the governor's social-distancing orders are giving abortion patients the unfettered freedom to opt for surgical abortions during the COVID-19 pandemic, even though medication abortions require less patient contact with clinic staff and less patient time at the clinic.

## FACTS RELATED TO STANDING

46. Plaintiffs AALFA Clinic, Paul J. Spencer, D.O., Mary M. Paquette, M.D., Matthew J. Paquette, M.D., Kathleen Kobbermann, M.D., Cheryl McKee, PA-C, MPAS,

Patrick G Spencer FNP-C, MSN, RN, Matthew Anderson, M.D., OB/GY, Sarah Slattery, PA-C, MPAS, and Abigail Tierney, PA are using personal protective equipment to provide medically necessary healthcare during this time of worldwide shortage. Their lives, health, and safety are endangered by the defendants' unnecessary use of personal protective equipment on surgical abortions when medication abortion can be performed instead. This injury is traceable to the defendants' conduct, and it will be redressed by relief that enjoins the performance of surgical abortions when medication abortion is available.

47.  Plaintiff Peter J. Daly is an orthopedic surgeon who has been compelled to stop all elective surgeries on account of EO 20-09. His practice has had to furlough 90% of his employees without pay, and he has had to postpone 90% of his surgeries. Yet the governor is allowing elective abortions to continue unabated. The governor's discriminatory decision to shut down elective orthopedic surgeries while allowing elective abortions to continue inflicts injury in fact on Dr. Daly and his patients. This injury is traceable to the defendants' conduct, and it will be redressed by relief that enjoins the performance of surgical abortions when medication abortion is available, or by relief that enjoins the defendants from enforcing EO 20-09 or similar executive orders unless they restrict abortion on the same terms as other elective surgeries or procedures.

48.  Plaintiff American Association of Pro-Life Obstetricians and Gynecologists (AAPLOG) is a membership organization of obstetricians and gynecologists. AAPLOG has associational standing to challenge the decision to exempt surgical abortions from the requirements of Executive Order 20-09.

49.  Members of AAPLOG have standing to sue in their own right. Likewise, the interests that the organization seeks to protect are germane to its purpose, and there is

no need for the individual members to participate in this lawsuit. AAPLOG has members who are treating COVID-19 patients, and their lives, health, and safety are endangered by the defendants' diversion of scarce personal protective equipment toward elective and unnecessary surgical abortions. These members of AAPLOG would have standing had they sued as individuals.

50. The interests that AAPLOG seeks to protect in the litigation are germane to the organization's purpose. As its name suggests, AAPLOG is an organization that seeks to protect human life at all stages, including the human lives that are being endangered by the defendants' use of PPE on elective and unnecessary surgical abortions.

51. Neither the claims asserted by AAPLOG nor the relief requested in this litigation requires the participation of AAPLOG's individual members.

52. Plaintiff Pro-Life Action Ministries (PLAM) is a Minnesota non-profit corporation. PLAM has associational standing to challenge the decision to exempt surgical abortions from the requirements of Executive Order 20-09.

53. Members of PLAM have standing to sue in their own right. Likewise, the interests that the organization seeks to protect are germane to its purpose, and there is no need for the individual members to participate in this lawsuit. PLAM has members who are or will potentially be COVID-19 patients, and their lives, health, and safety are endangered by the defendants' diversion of scarce personal protective equipment toward elective and unnecessary surgical abortions. These members of PLAM would have standing had they sued as individuals.

54. The interests that PLAM seeks to protect in the litigation are germane to the organization's purpose. As its name suggests, PLAM is an organization that seeks to protect human life at all stages, including the human lives that are being endangered by the defendants' use of PPE on elective and unnecessary surgical abortions.

55. Neither the claims asserted by PLAM nor the relief requested in this litigation requires the participation of PLAM's individual members.

56. Plaintiffs Rebecca Vavilov, Sarah Clochie, Melanie Schumacher, Noel Diedrich, Bernadine Schneider, Victoria Pauling, James Benyon, Cynthia Deal, Mike and Angie Fuith, Greg Schmitz, Joseph Docksey, Paulette Kostick, Jennifer Steffel, Julie Millman, and Jack Dorcey, are members of churches throughout Minnesota and are currently prohibited from exercising their constitutional right to hold in-person worship services on account of Executive Orders 20-20 and 20-33. Yet state officials are refusing to curtail the right to abortion in any manner in response to the COVID-19 pandemic, even though a suspension of surgical abortions whenever medication abortion can be used would conserve PPE and increase social distancing without denying any women the ability to abort her pregnancy. These individual plaintiffs are suffering injury in fact on account of this discriminatory treatment. This injury is traceable to the defendants' conduct, and it will be redressed by relief that enjoins the performance of surgical abortions when medication abortion is available.

## CLAIM NO. 1—EQUAL PROTECTION

57. The Plaintiffs adopt and incorporate by reference all previous paragraphs as if fully restated in support of the further allegations asserted under the instant claim.

58. The Fourteenth Amendment of the U.S. Constitution forbids the States to deny to any person within their jurisdiction the equal protection of the laws.

59. The Governor's executive orders and the State's enforcement of them violate the Equal Protection Clause by imposing discriminatory burdens on the exercise of fundamental rights.

60. The First Amendment protects the right of the people to peaceably assemble. It also protects the right to freely exercise one's religious beliefs. Each of these is considered a "fundamental right" for purposes of the Equal Protection Clause.

61. The State is subordinating the fundamental right to practice one's religion to COVID-19 prevention measures by banning its residents from attending church. The State is also restricting the fundamental right of the people to peaceably assemble, and requiring that right to yield to the State's social-distancing restrictions.

62. But when it comes to the right to have an abortion, the State has decided that this right is sacrosanct, and that *no* COIVD-19 prevention measure can be allowed to curtail the right to abortion in any way—no matter how minor the burdens that might be imposed on abortion providers or their patients, and no matter how many lives might be saved from requiring abortion providers to switch from surgical abortion to medication abortion in an effort to conserve PPE and increase social distancing.

63. The State's decision to burden the fundamental rights to practice one's religion and to peaceably assemble—while categorically exempting the right to abortion from any abridgement whatsoever by COVID-19 prevention measures—is subject to strict scrutiny under the Equal Protection Clause. *See Plyler v. Doe*, 457 U.S. 202, 216–17 (1982) ("[W]e have treated as presumptively invidious those classifications that disadvantage a 'suspect class,' or that impinge upon the exercise of a 'fundamental right.' With respect to such classifications, it is appropriate to enforce the mandate of equal protection by requiring the State to demonstrate that its classification has been precisely tailored to serve a compelling governmental interest." (footnotes omitted)). The State is discriminating against residents who wish to exercise their fundamental rights to practice their religion and peaceably assemble by allowing the State's social-distancing measures to curtail those constitutional rights, and it is discriminating in favor of residents who wish to exercise the right to abortion by allowing the right to abortion to trump any COVID-19 prevention measures designed to preserve PPE or encourage social distancing. Classifications of this sort cannot be sustained unless they can satisfy the demanding standard of "strict scrutiny."

64. The State's decision to allow abortion providers to continue performing surgical abortions unimpeded during the COVID-19 pandemic cannot survive strict scrutiny.

65. There is no compelling state interest in allowing abortion providers to continue performing surgical abortion during the COVID-19 pandemic when medication abortion can achieve the same result. Even if one assumes for the sake of argument that the State has a "compelling interest" in ensuring that pregnant women can abort their fetuses, that interest is fully served by allowing medication abortions to continue, which consume less PPE than surgical abortion and require less contact between patients and staff and less patient time at the abortion clinic.

66. The State also cannot establish that its orders are "precisely tailored" to the compelling interest in preventing the spread of COVID-19 when the State is giving abortion providers a free pass to consume PPE and increase the risk of virus transmission by performing surgical abortions when medication abortion could be used instead.

67. Indeed, the State's decision to exempt surgical abortion from the State's COVID-19 prevention efforts cannot even satisfy rational-basis review. There is no legitimate governmental interest in allowing abortion patients to opt for a method of abortion that consumes more PPE, and at a time when all other elective and non-essential medical procedures are being postponed in an effort to conserve as much PPE as possible for those fighting the COVID-19 pandemic. And there is no legitimate governmental interest in allowing abortion patients to opt for a method of abortion that undermines the State's social-distancing efforts and increases the risk of transmitting COVID-19 relative to medication abortion.

68. Each of the defendants is acting under color of state law and depriving the plaintiffs of their constitutional rights under the Equal Protection Clause. *See* 42 U.S.C. § 1983. The defendant abortion clinics are acting under color of state law because they

have received special dispensations from the State's COVID-19 orders, and their conduct has been explicitly authorized by state officials. *See* Torey Van Oot, *Minnesota Providers Can Continue Abortion, Drawing Criticism From Some*, Star Tribune (March 31, 2020), available at http://strib.mn/3cfFnJP (attached as Exhibit 3); Executive Order 20-20(6)(a)(ii) (exempting workers who provide "reproductive health care" from the order's social-distancing requirements whenever they perform "work duties that cannot be done at their homes or residence"); Executive Order 20-33 (6)(a)(ii) (same); *see also Lugar v. Edmondson Oil Co. Inc.*, 457 U.S. 922 (1982) (holding private parties subject to liability under 42 U.S.C. § 1983 when acting pursuant to an unconstitutional state law).

### CLAIM NO. 2—ABORTION IS NOT A CONSTITUTIONAL RIGHT

69.     It is possible that the defendants believe that abortion providers should have special allowances to consume PPE during a deadly pandemic because past opinions from the Supreme Court have said that abortion is constitutional right. *See, e.g.*, *Roe v. Wade*, 410 U.S. 113 (1973); *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833 (1992). This has some people to believe that nothing should ever be allowed to take priority over the convenience of abortion patients and the profit margins of abortion providers. It does not matter that our nation is in the midst of a horrific pandemic that has already killed 50,000 Americans and threatens to kill hundreds of thousands more. It does not matter that medical professionals on the front lines of COVID-19 are facing shortages of PPE and could die if PPE is diverted to elective and medically unnecessary procedures such as surgical abortion. It does not matter how many lives would be saved if the PPE that they are consuming on elective surgical abortions were redirected to COVID-19 efforts or other life-saving medical care. The right to abortion is absolute—to the point that it allows abortion patients to opt for a particular method of abortion that consumes more PPE, even when that PPE is needed to prevent others from falling sick and dying during a catastrophic global pandemic.

70. Abortion providers might be justified in holding these views if abortion actually were a constitutional right. But abortion is not a constitutional right. There is nothing in the language of the Constitution that even remotely suggests that women have a constitutional right to abort their fetuses. *See* John Hart Ely, *The Wages of Crying Wolf: A Comment on Roe v. Wade*, 82 Yale L.J. 920, 947 (1973) ("Roe v. Wade . . . is *not* constitutional law and gives almost no sense of an obligation to try to be." (emphasis in original)); Richard A. Epstein, *Substantive Due Process By Any Other Name: The Abortion Cases*, 1973 Sup. Ct. Rev. 159. Nor is there any historical pedigree to support the notion of an implied constitutional right to abortion, as abortion was criminalized for an entire century before *Roe* was decided.

71. The Constitution makes no allowance for the Supreme Court to invent or impose constitutional "rights" that have no grounding in constitutional text or historical practice. *Roe v. Wade* and the Supreme Court's subsequent abortion edits violate the Tenth Amendment and the Republican Form of Government Clause by subordinating state laws to the policy preferences of unelected judges. The members of the *Roe* majority may have believed very strongly that abortion should be freely available in all 50 states as a matter of policy, but that is not a basis on which a court may enjoin the enforcement of a duly enacted statute.

72. The Supreme Court's membership has changed since its last abortion pronouncement. Justice Kennedy, who joined the five-justice majority opinion in *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016), has been replaced by Justice Kavanaugh. Justice Scalia, who died before *Hellerstedt* was decided, has been replaced by Justice Gorsuch. So it is far from clear that *Roe v. Wade* retains majority support on the current Supreme Court. It is time for the lower courts to force reconsideration of *Roe* in the Supreme Court by announcing that they will follow the Constitution rather than a widely criticized judicial opinion that is unlikely to have majority support among the

sitting justices. *See Graves v. New York*, 306 U.S. 466, 491–92 (1939) (Frankfurter, J., concurring) ("[T]he ultimate touchstone of constitutionality is the Constitution itself and not what we have said about it.").

73. The plaintiffs therefore seek a declaratory judgment that: (a) There is no constitutional right to have an abortion; and (b) The previous Supreme Court's abortion jurisprudence violates the Tenth Amendment and the Republican Form of Government Clause by subordinating state law to the policy preferences of unelected judges.

74. If the Court believes that it is duty-bound to adhere to *Roe* notwithstanding its violation of the Constitution and the recent change of membership on the Supreme Court, then the plaintiffs respectfully wish to preserve this claim for appeal and for an eventual certiorari petition.

## DEMAND FOR RELIEF

75. The plaintiffs respectfully request that the court:

   a. declare that the defendants are violating the Equal Protection Clause by exempting surgical abortion from the State's COVID-19 prevention measures;

   b. preliminarily and permanently enjoin Governor Walz and Commissioner Malcolm from enforcing Executive Orders 20-09, 20-20, and 20-30, and any current or future executive orders that restrict elective surgeries, regulate the use or consumption of PPE, restrict church attendance, or impose social-distancing requirements, unless and until those orders are amended or reinterpreted to prohibit surgical abortions except for patients who are contraindicated for medication abortion, or for patients who were unable to schedule and obtain a medication abortion during the time in which medication abortion is legally available in Minnesota;

  c. preliminarily and permanently enjoin the defendant abortion clinics from performing surgical abortions except on patients who are contraindicated for medication abortion, or on patients who were unable to schedule and obtain medication abortion during the time in which medication abortion is legally available in Minnesota;

  d. award the plaintiffs nominal and compensatory damages;

  e. award costs and attorneys' fees under 42 U.S.C. § 1988;

  f. grant all other relief that the Court deems just, proper, or equitable.

               Respectfully submitted.

|  |  |
|---|---|
| | /s/ Erick G. Kaardal |
| THOMAS BREJCHA* | ERICK G. KAARDAL |
| Illinois Bar No. 0288446 | Minnesota Bar No. 0229647 |
| MARTIN WHITTAKER* | Mohrman, Kaardal & Erickson, P.A. |
| Illinois Bar No. 6208211 | 150 South Fifth Street, Suite 3100 |
| Thomas More Society | Minneapolis, Minnesota 55402 |
| 309 West Washington Street, Suite 1250 | (612) 341-1074 (phone) |
| Chicago, Illinois 60606 | (612) 341-1076 (fax) |
| (312) 782-1680 (phone) | kaardal@mklaw.com |
| (312) 782-1887 (fax) | |
| info@thomasmoresociety.org | JONATHAN F. MITCHELL* |
| | Texas Bar No. 24075463 |
| | Mitchell Law PLLC |
| | 111 Congress Avenue, Suite 400 |
| | Austin, Texas 78701 |
| | (512) 686-3940 (phone) |
| * *pro hac vice* applications | (512) 686-3941 (fax) |
|   forthcoming | jonathan@mitchell.law |
| Dated: April 28, 2020 | *Counsel for Plaintiffs* |