IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
FOURTH DIVISION

|  |  |
|---|---|
| **AALFA Family Clinic**, et al. | |
| Plaintiffs, | |
| v. | Case No. 0:20-cv-01037-PJS-DTS |
| **Tim Walz**, et al., | |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

The Governor of Minnesota has issued an executive order that prohibits all "non-essential or elective surgeries and procedures" that use personal protective equipment (PPE). *See* Executive Order 20-9 (attached as Exhibit 2). The governor has also issued stay-at-home orders that prohibit Minnesotans from exercising their constitutional rights to attend church and peaceably assemble in an effort to maintain social distancing. *See* Executive Order 20-20 (attached as Exhibit 4); Executive Order 20-33 (attached as Exhibit 5); Executive Order 20-48 (attached as Exhibit 6).

But the state's officials are refusing to enforce these orders against abortion providers. The Minnesota Department of Health has given abortion providers free rein to continue using PPE on elective abortions, even though other elective procedures have been suspended to conserve PPE for life-saving or essential health care during this time of worldwide shortage. *See* Torey Van Oot, *Minnesota Providers Can Continue Abortion, Drawing Criticism From Some*, Star Tribune (March 31, 2020), available at http://strib.mn/3cfFnJP (attached as Exhibit 3). The state's officials are even allowing abortion patients to demand an elective *surgical* abortion — which consumes more PPE

than a medication abortion[1]—even when medication abortion could be used to achieve the same result.

The state's officials are also allowing abortion clinics to flout social-distancing guidelines by performing surgical abortions on patients when medication abortion could be used instead. A surgical abortion cannot comply with social-distancing guidelines because the physician must come within six feet of the patient when performing the procedure. *See* Declaration of Kathi Aultman, M.D. (Aultman Decl.) ¶¶ 15, 21 (attached as Exhibit 8). Medication abortion, by contrast, is not performed in an abortion clinic and does not require a physician or any clinic staff to come within six feet of the patient. *See id.* Yet the state's officials are refusing to impose any social-distancing limitations on a patient's choice of abortion procedure, while simultaneously insisting that other constitutional rights (such as the right to attend church) must yield to state-imposed social-distancing guidelines.

The Constitution does not permit state officials to give abortion providers special dispensations from its elective-surgery ban or from the social-distancing rules that are being imposed on every Minnesota resident. The government unquestionably has the authority to ban elective surgeries that consume PPE during a pandemic, but the Equal Protection Clause does not allow state officials to ban elective surgeries while giving abortion providers a blank check to consume PPE on elective surgical abortions—especially when the patient could opt for a medication abortion that uses less PPE. In like manner, the State's police powers allow it to impose social-distancing requirements that curtail the exercise of constitutional rights during a pandemic. But a State cannot give special status to politically favored rights such as abortion—to the point of refusing even to limit a patient's choice among the different *methods* of abortion—while

---

1.  *See* Declaration of Kathi Aultman, M.D. (Aultman Decl.) ¶ 20 (attached as Exhibit 8).

simultaneously insisting that the constitutional right to attend church must yield to social-distancing mandates.

The state's officials are violating the Equal Protection Clause by giving abortion providers a free pass from restrictions on elective surgeries that are being imposed on every other health-care provider in Minnesota. The state's officials are also violating the Equal Protection Clause by prohibiting Minnesota residents from attending church in the name of social distancing, while simultaneously refusing to extend any social-distancing regulations to a patient's choice of abortion procedure. These preferential treatments for abortion cannot be justified under any tier of equal-protection scrutiny, and they especially cannot be justified when the State's COVID-19 prevention edicts are infringing fundamental constitutional rights.[2]

The defendants are also imposing irreparable injury on the plaintiff health-care providers by allowing PPE to be needlessly consumed on elective surgical abortions. The COVID-19 pandemic has led to a worldwide shortage of PPE, which is endangering the lives of doctors and nurses on the front lines of the pandemic and all other medical professionals who provide essential health care. Yet the State is allowing abortion providers and patients to consume extra PPE on surgical abortions when a medication abortion could be performed instead, which is squandering scarce PPE on an unnecessary surgical procedure and threatening the lives and safety of every medical professional who needs PPE during this time of worldwide shortage. The defendants are also imposing irreparable discriminatory burdens on doctors who perform elective surgeries other than abortion, as well as the patients who need those non-abortion

---

2. The plaintiffs are not seeking relief on the theory that the state officials are violating the governor's executive orders, and the federal courts are jurisdictionally barred from considering claims that a state official is acting is violation of state law. *See Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 117 (1984). The defendants are violating 42 U.S.C. § 1983 and the plaintiffs' rights under the Equal Protection Clause — regardless of whether they are properly interpreting the governor's executive order as a matter of state law.

elective surgeries, by forcing them to bear the brunt of the State's PPE-conservation measures while abortion providers and patients are given carte blanche to consume PPE on whatever abortion procedure they prefer.

The plaintiffs are not requesting a preliminary injunction that bans abortion—and they are not seeking an injunction that categorically suspends the performance of surgical abortion during the COVID-19 pandemic. The plaintiffs ask only for a preliminary injunction that blocks the defendant abortion clinics from performing surgical abortions when the patient could obtain a medication abortion instead. This would allow surgical abortions to continue for patients who: (1) are contraindicated for medication abortion; or (2) were unable to schedule and obtain medication abortion during the time in which medication abortion is legally available in Minnesota. The plaintiffs also seek a preliminary injunction that prevents the state's officials from enforcing Executive Orders 20-09, 20-20, 20-30, 20-48, and any current or future executive order that restricts elective surgeries, regulates the use or consumption of PPE, restricts church attendance, or imposes social-distancing requirements—unless and until those orders are amended or reinterpreted to prohibit surgical abortions on patients who could obtain a medication abortion instead. These proposed injunctions will expire when state officials lift all social-distancing requirements and all restrictions on the performance of elective surgeries.

Abortion providers and patients will suffer little if any harm from the requested relief. Anyone who wants an abortion in Minnesota will still be able to obtain one. The only requirement is that they use medication abortion rather than surgical abortion when medication abortion is available. That is not too much to ask—especially when providers of elective surgeries other than abortion are shut down entirely and their patients have no choice but to wait for the governor to lift his restrictions on elective surgeries. Finally, the public interest strongly counsels in favor of this relief, which will

conserve PPE and increase social distancing in the midst of a horrific pandemic that has already killed over 67,000 Americans and threatens to kill thousands more.

## STATEMENT OF FACTS

On March 13, 2020, Governor Tim Walz declared a peacetime emergency in response to the COVID-19 outbreak. *See* Executive Order 20-01 (attached as Exhibit 1). The governor has since issued executive orders that suspend the performance of elective surgeries (EO 20-09), and that impose social-distancing requirements (EO 20-20, EO 20-33, and EO-48) (attached as Exhibits 3–5).

## I.     Executive Order 20-09

The COVID-19 pandemic has produced a worldwide shortage of personal protective equipment (PPE), such as masks, gloves, gowns, and face shields. This shortage is threatening the lives of doctors and nurses on the front lines of the pandemic, who are already being instructed to re-use the masks and gowns that are needed to protect themselves and their colleagues from the highly contagious virus.[3] It is also putting the entire American health-care system at risk of collapse. If hospitals run out of personal protective equipment and medical professionals begin falling sick and dying, then the nation will become incapable of treating those who acquire the COVID-19 virus, which will drastically increase the number of infections and lead to a loss of life of catastrophic proportions.

In response to this threatened calamity, Governor Walz issued Executive Order 20-09, which postpones "all non-essential or elective surgeries and procedures, including non-emergent or elective dental care, that utilize PPE or ventilators." The order suspends non-essential or elective surgeries and procedures "for the duration of the

---

3.  See Andrew Jacobs, Matt Richtel, and Mike Baker, *"At War With No Ammo": Doctors Say Shortage of Protective Gear Is Dire*, New York Times (March 19, 2020), available at https://nyti.ms/2UYZMvs; Melanie Evans and Khadeeja Safdar, *Hospitals Facing Coronavirus Are Running Out of Masks, Other Key Equipment*, Wall Street Journal (March 18, 2020), available at https://on.wsj.com/39FTPsG.

peacetime emergency declared in Executive Order 20-01 or until this Executive Order is rescinded." *See* Executive Order 20-09 (attached as Exhibit 2).

Executive Order 20-09 explains why Governor Walz ordered a halt to all non-essential or elective surgeries and procedures that use PPE:

> COVID-19 cases in Minnesota are rapidly increasing and risk overwhelming the healthcare system. On March 17, 2020, the Centers for Disease Control and Prevention recommended delaying elective inpatient and outpatient surgeries and procedures, which include dental procedures. On March 18, 2020, the Centers for Medicare and Medicaid Services ("CMS") issued similar guidance. CMS recognizes that conservation of critical resources such as ventilators and personal protective equipment ("PPE") is essential to aggressively address the COVID-19 pandemic. CMS has also recognized that non-emergent or elective procedures increase patient and provider contact, which could increase the risk of COVID-19 transmission. This risk provides further reason to delay elective surgeries and procedures. To ensure the health and safety of Minnesotans, it is important to establish consistency throughout our healthcare system and ensure that our resources can be focused on responding to this pandemic.

*See* Executive Order 20-09 (attached as Exhibit 2). The order defines a "non-essential surgery or procedure" as:

> a surgery or procedure that can be delayed without undue risk to the current or future health of a patient. Examples of criteria to consider in making this determination include:
>
> a. Threat to the patient's life if surgery or procedure is not performed.
> b. Threat of permanent dysfunction of an extremity or organ system, including teeth and jaws.
> c. Risk of metastasis or progression of staging.

*See* Executive Order 20-09 (attached as Exhibit 2). Any person who willfully violates Executive Order 20-09 is guilty of a misdemeanor, and is punishable by a fine not to exceed $1,000, or by imprisonment for not more than 90 days. *See* Executive Order 20-09 (attached as Exhibit 2).

The vast majority of surgical abortions are "elective" procedures,[4] *see* Aultman Decl. at ¶ 23, and all of them require the use of PPE, *see id.* at ¶¶ 15–19.[5] The only time abortion is not "elective" is when it is performed for the purpose of saving the life or health of the mother. *See* Aultman Decl. ¶ 23. So the text of Executive Order 20-09 prohibits the continued performance of elective surgical abortions. Nevertheless, the Minnesota Department of Health has decided to categorically exempt abortion providers and their patients from the requirements of Executive Order 20-09, and the governor has "deferred" to the Department's decision. *See* Torey Van Oot, *Minnesota Providers Can Continue Abortion, Drawing Criticism From Some*, Star Tribune (March 31, 2020), available at http://strib.mn/3cfFnJP (attached as Exhibit 3).

State officials have also refused to take the more limited step of requiring abortion patients and providers to use medication abortion over surgical abortion. Surgical abortion requires more extensive use of personal protective equipment, and it requires the use of gloves, surgical masks, and protective eyewear while the procedure is performed. *See* Aultman Decl. ¶¶ 15–19 (attached as Exhibit 8). Medication abortion, by contrast, requires less use of PPE because the abortion-inducing drugs are taken at home without clinic personnel present. *See id.* at ¶ 20. Although some PPE might still be consumed during a pre-abortion ultrasound or a post-abortion follow-up appointment, that is equally true for both surgical and medication abortion. *See id.* So less PPE will be consumed if a patient opts for medication abortion over surgical abortion, and the

---

4. *See* Aultman Decl. ¶¶ 23 (attached as Exhibit 8).

5. *See also In re Rutledge*, --- F.3d ---, 2020 WL 1933122, at *2 (8th Cir. Apr. 22, 2020) ("Surgical abortions, like other surgical procedures, ordinarily require providers to use PPE to prevent 'exposure to blood and other bodily fluids and tissue, and to protect the patient from infection.' The relevant PPE in a surgical abortion could include a surgical mask, gloves, gown, and eye protection. Moreover, given the increasing risk of infection, all patients who undergo any type of surgical procedure may themselves need to use PPE in order to avoid contracting COVID-19.").

State will conserve significant PPE by requiring abortion providers and patients to use medication abortion over surgical abortion when each method of abortion is available.

## II. The Governor's Stay-at-Home Orders (Executive Orders 20-20, 20-33, and 20-48)

The COVID-19 pandemic has also led state officials to impose social-distancing requirements to reduce the spread of the virus.

On March 25, 2020, Governor Walz issued a stay-at-home order, which compels Minnesotans to stay at home or in their place of residence except to engage in the "Activities and Critical Sector Work" described in the order. *See* Executive Order 20-20 (attached as Exhibit 4). On April 8, 2020, Governor Walz extended this stay-at-home order to May 3, 2020. *See* Executive Order 20-33 (attached as Exhibit 5). On April 30, 2020, Governor Walz extended the stay-at-home order to May 18, 2020. *See* Executive Order 20-48 (attached as Exhibit 6). The governor's stay-at-home orders limit the exercise of fundamental constitutional rights, as they prohibit Minnesotans from attending in-person church services and exercising their constitutional right to peaceably assemble.

The governor's stay-at-home orders list "reproductive health care" as one of the "critical sectors" exempt from the order's work-at-home requirements. *See, e.g.*, Executive Order 20-48(6)(a)(ii) (attached as Exhibit 6). But the governor's order still requires abortion providers—and all other "critical sectors"—to practice "social distancing to the maximum extent possible." *See* Executive Order 20-48(5); *see also* Executive Order 20-48(7) ("All exempted Activities and Critical Sector work activities should be conducted in a manner that adheres to Minnesota OSHA Standards and the MDH and CDC Guidelines related to COVID-19, including social distancing and hygiene.").

Despite the ostensible requirement in the governor's order that abortion clinics practice social distancing to the maximum possible extent, the state's officials are not imposing or enforcing *any* social-distancing requirements when it comes to a patient's

choice of abortion procedures. Social distancing requires an abortion patient to opt for medication abortion over surgical abortion whenever medication abortion is available. It is impossible for surgical abortion to comply with social-distancing guidelines because the physician must perform the procedure within six feet of the patient. *See* Aultman Decl. ¶ 15 (attached as Exhibit 8). Medication abortion, by contrast, is not performed in the abortion clinic, and it does not require a physician or any clinic staff to come within six feet of the patient. *See* Aultman Decl. ¶ 21 (attached as Exhibit 8). Indeed, one of the defendant abortion clinics recognizes that medication abortion is more consistent with social-distancing and the need to protect public safety, and it is "recommending" that its patients opt for medication abortion over surgical abortion "to keep with social distancing mandates":

> Our physicians recommend that any patient 10 weeks and earlier have a medication abortion to keep with social distancing mandates. Please seriously consider this option as this can help keep you and our staff safer. This method requires less staff contact and less time at our clinic.

https://wehealthclinic.org (last visited on May 3, 2020) (attached as Exhibit 7). Yet the defendant abortion clinics are still performing surgical abortions on any patient who asks for one — even when medication abortion is available — while state officials look the other way.

## THE PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION

There are four factors to consider in determining whether a preliminary injunction should issue: "(1) whether there is a substantial probability movant will succeed at trial; (2) whether the moving party will suffer irreparable injury absent the injunction; (3) the harm to other interested parties if the relief is granted; and (4) the effect on the public interest." *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 112 (8th Cir. 1981) (en banc). Each of these four factors supports a preliminary injunction.

## I.  There Is A Substantial Probability That The Plaintiffs Will Succeed On Their Challenge To The State's Discriminatory Exemption Of Abortion From Its Elective-Surgery Ban And Social-Distancing Rules

The Fourteenth Amendment of the U.S. Constitution forbids the States to deny to any person within their jurisdiction the equal protection of the laws. The State of Minnesota is violating the Equal Protection Clause in two separate and distinct ways.

First, the State is violating equal protection by completely exempting abortion providers from its restrictions on PPE consumption. Executive Order 20-09 bans *all* "non-essential or elective surgeries and procedures" that use personal protective equipment (PPE). *See* Executive Order 20-9 (attached as Exhibit 2). Yet the State is not only allowing abortion providers to consume PPE on elective abortions, it is even allowing them to perform elective *surgical* abortions—which consume more PPE than medication abortions—when medication abortion could be performed on the patient instead. The Equal Protection Clause does not allow a State to ban all elective surgeries and procedures in the name of conserving PPE, and then allow politically favored constituents such abortion providers to consume as much PPE as they wish. Nor does the Equal Protection Clause allow a State to prevent patients from obtaining elective surgeries in the name of conserving PPE, and then allow abortion patients to not only obtain elective abortions but also to choose a particular *method* of elective abortion that consumes more PPE.

The State's decision to categorically exempt abortion providers from its restrictions on PPE consumption cannot satisfy any standard of equal-protection scrutiny. Even under rational-basis review, a State must explain how its classifications "bear a rational relationship to an independent and legitimate legislative end." *Romer v. Evans*, 517 U.S. 620, 633 (1996). And even if one were to assume that the State has a "legitimate" interest in ensuring access to abortion at a time when all other elective procedures are banned, that interest can be achieved by allowing medication abortions to continue,

while permitting surgical abortions only when medication abortion is unavailable for that particular patient.

A policy that allows abortion patients to consume PPE by opting for surgical abortion over medication abortion has nothing to do with ensuring access to the abortion procedure. The choice between the two abortion procedures concerns only the convenience and comfort of abortion patients. But a state cannot justify a policy that withholds all PPE from patients seeking elective surgeries other than abortion, while permitting abortion patients to not only consume PPE on an elective procedure, but also to consume *additional* PPE by opting for the *method* of abortion that consumes more PPE than the alternative. The State has no legitimate interest in allocating scarce PPE toward accommodating an abortion patient's choice of surgical abortion over medication abortion, when it is withholding all PPE from the non-abortion patients who are completely denied access to elective surgeries. And there is no legitimate interest in elevating the comfort and convenience of abortion patients—who can still obtain the elective abortions that they seek—over the medical needs of non-abortion patients who cannot obtain *any* elective surgeries or procedures during the pandemic.

The State is also violating equal protection by refusing to apply its social-distancing requirements to a patient's choice of abortion procedure. Surgical abortion violates social-distancing guidelines because it requires a physician to perform the procedure within six feet of the patient. With medication abortion, the procedure is done at home and does not require doctors or clinic employees to come within a six-foot radius of the patient. The state's officials, however, are refusing to require abortion providers or patients to use medication abortion over surgical abortion, and they are allowing them to endanger the public safety by performing surgical abortion whenever a patient asks for it. The Equal Protection Clause does not permit a State to give abortion providers and patients special allowances to violate social-distancing guidelines when the State is

simultaneously enforcing its social-distancing requirements in a manner that infringes fundamental rights.

When a state classification infringes upon a "fundamental right," a court must apply strict scrutiny. *See Plyler v. Doe*, 457 U.S. 202, 216–17 (1982) ("[W]e have treated as presumptively invidious those classifications that disadvantage a 'suspect class,' or that impinge upon the exercise of a 'fundamental right.' With respect to such classifications, it is appropriate to enforce the mandate of equal protection by requiring the State to demonstrate that its classification has been precisely tailored to serve a compelling governmental interest." (footnotes omitted)).[6] The State is currently using its social-distancing requirements to prevent Minnesotans from exercising their fundamental rights to attend church and peaceably assemble. *See, e.g.*, Executive Order 20-48. A State may require fundamental rights to yield to its efforts to prevent the spread of a pandemic. *See Jacobson v. Massachusetts*, 197 U.S. 11 (1905). But a State may not give special status to politically favored rights such as abortion when fundamental constitutional rights — such as the right to the free exercise of the religion and the right of the people to peaceably assemble — are being subordinated to the State's COVID-19 prevention measures. If a State wants to ban church services in the name of social distancing, while simultaneously allowing abortion patients to violate social-distancing guidelines by opting for surgical abortion over medication abortion, then the State must satisfy the requirements of strict scrutiny by demonstrating that its policy is "precisely tailored to serve a compelling governmental interest." *Plyler v. Doe*, 457 U.S. 202, 216–17 (1982).

There is no "compelling governmental interest" in ensuring that abortion patients may choose the particular method of abortion that they prefer, especially when the

---

6. See also *Harper v. Virginia State Board of Elections*, 383 U.S. 663, 670 (1966) ("[W]here fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined.").

choice of surgical abortion will endanger the public health and safety. If the need for social distancing is so compelling as to trump the constitutional right to attend church, then it is sufficiently important to trump an abortion patient's desire for a particular abortion procedure. The State's decision to exempt a patient's choice of abortion procedure from its social-distancing rules does not reflect a "compelling" interest of any sort, but a naked preference for abortion rights over religious freedom and other fundamental rights. *See* Cass R. Sunstein, *Naked Preferences and The Constitution*, 84 Colum. L. Rev. 1689 (1984).

Finally, an injunction that prevents surgical abortion when medication abortion is available will not violate the Supreme Court's abortion jurisprudence by imposing an "undue burden" on abortion patients. *See, e.g., Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 874 (1992) (plurality opinion). The court-created right to abortion is implicated only by laws that restrict or burden a patient's access to abortion; there is no constitutional right to use whatever method of abortion a patient desires. *See Gonzales v. Carhart*, 550 U.S. 124 (2007) (upholding a federal ban on partial-birth abortion); *id.* at 163 (2007) (explaining that "the law need not give abortion doctors unfettered choice in the course of their medical practice, nor should it elevate their status above other physicians in the medical community."). And the Eighth Circuit has already held that the Constitution permits a State to ban all surgical abortions during the COVID-19 pandemic. *See In re Rutledge*, --- F.3d ---, 2020 WL 1933122, at *2 (8th Cir. Apr. 22, 2020). The plaintiffs are requesting a more limited remedy that would prevent surgical abortions only when medication abortion could be performed on the patient. The holding of *Rutledge* is a binding pronouncement, and it establishes beyond doubt that the requested injunction is constitutional.

## II.    The Plaintiffs Will Suffer Irreparable Injury Absent A Preliminary Injunction

The plaintiffs in this case fall into three groups: (1) Medical professionals who need PPE to provide essential health care during the COVID-19 pandemic;[7] (2) Medical professionals who are being prohibited from using PPE on non-abortion elective surgeries;[8] and (3) Churchgoers whose First Amendment rights are being infringed by the State's social-distancing measures.[9]

The medical professionals who need PPE for essential health care will suffer irreparable injury absent a preliminary injunction, because the continued use of PPE on elective and unnecessary surgical abortions is depleting the already scarce supply of these materials. There is currently a worldwide shortage of PPE. *See* Declaration of Paul J. Spencer, D.O. (Spencer Decl.) ¶¶ 5–6 (attached as Exhibit 9); *see also* Andrew Jacobs, Matt Richtel, and Mike Baker, *"At War With No Ammo": Doctors Say Shortage of Protective Gear Is Dire*, New York Times (March 19, 2020), available at https://nyti.ms/2UYZMvs; Melanie Evans and Khadeeja Safdar, *Hospitals Facing Coronavirus Are Running Out of Masks, Other Key Equipment*, Wall Street Journal (March 18, 2020), available at https://on.wsj.com/39FTPsG. And this shortage is already forcing doctors and medical professionals to re-use masks and gowns that are needed to protect themselves and their colleagues from COVID-19. *See id.* The AALFA Family Clinic, for example, was unable to obtain N-95 masks through its regular suppliers, and after an extensive search was finally able to purchase industrial N-95 masks at a local building supply store for $35 apiece. *See* Spencer Decl. at ¶ 6. The AAFLA Family Clinic has

---

7.  These plaintiffs include the AALFA Family Clinic, Dr. Spencer, Dr. Paquette, Dr. Paquette, Dr. Kobbermann, Ms. McKee, Mr. Spencer, Dr. Anderson, Ms. Slattery, Ms. Tierney, Dr. Daly, and the American Association of Pro-Life Obstetricians and Gynecologists (AAPLOG).

8.  These plaintiffs include Dr. Daly and Dr. Anderson.

9.  These plaintiffs include Ms. Vavilov, Ms. Schumacher, Mr. Diedrich, Ms. Pauling, Mr. Benyon, Mr. and Ms. Fuith, Mr. Schmitz, Ms. Kostick, and Ms. Steffel.

also encountered a shortage of gowns, which has forced Dr. Spencer to wear impro-vised devices. *See id.* The employees at the AAFLA Family Clinic have been required to sterilize and re-use their masks because of short supply, and some of its staff have been making their own masks in response to the shortage. *See id.* And Dr. Daly's clinic has been using cloth masks because its supply of surgical masks is so limited. *See* Dec-laration of Peter J. Daly, M.D. (Daly Decl.) ¶ 5 (attached as Exhibit 10).

Each of the medical-professional plaintiffs is suffering irreparable injury from the selfish and unjustifiable consumption of PPE on unnecessary surgical abortions. *See* Spencer Decl. at ¶ 11; Declaration of Matthew Anderson (Anderson Decl.) ¶ 9–10 (at-tached as Exhibit 11); Declaration of Peter J. Daly (Daly Decl.) ¶ 10 (attached as Ex-hibit 10); Declaration of Donna J. Harrison (Harrison Decl.) ¶ 6 (attached as Exhibit 12). The defendants' diversion of scarce PPE to unnecessary surgical abortions—when a medication abortion could be performed instead—is aggravating the world-wide shortage of PPE, and it is endangering the lives and safety of every medical pro-fessional who needs PPE to provide essential and life-saving healthcare during this pandemic. A preliminary injunction will alleviate these injuries by stopping the unnec-essary consumption of PPE on surgical abortions, and by suspending surgical abor-tions except in situations where a medication abortion cannot be performed on the patient.

Dr. Daly and Dr. Anderson are suffering additional irreparable injuries, because they are currently prohibited from using PPE to perform elective surgeries, while abor-tion providers have been given license to consume PPE on whatever elective abortion procedure a patient requests. Dr. Daly is an orthopedic surgeon, and he has been blocked from performing surgeries that are needed to alleviate severe pain and disabil-ities that his patients are experiencing. *See* Daly Decl. at ¶ 5. These prohibited surgeries include shoulder replacements for severe arthritis and fractures; arthroscopic shoulder

repairs of dislocating or unstable shoulders; and knee and hip replacements that enable his patients to walk and work. *See id.* Dr. Anderson is an OB/GYN surgeon, and he has been forced to postpone his non-emergent gynecologic surgeries on account of the governor's PPE-conservation edicts. *See* Anderson Decl. at ¶ 5. Two of Dr. Anderson's patients are suffering so much pain on account of this delay that he has had to place them on long-term narcotic therapy. *See id.*

Yet the State is forcing Dr. Daly and Dr. Anderson and their patients to bear the brunt of the State's PPE-conservation efforts, by banning them from consuming *any* PPE on elective surgeries, while simultaneously allowing scarce PPE to be diverted to abortion providers. And the State is allowing those abortion providers not only to consume PPE on elective abortions, but also to consume *additional* PPE whenever a patient requests an elective surgical abortion over an elective medication abortion—while telling Dr. Daly and Dr. Anderson that they may not use any PPE on elective surgeries no matter how much pain or suffering their patients are experiencing. Dr. Daly and Dr. Anderson are suffering irreparable injury both from their inability to use PPE on non-abortion elective surgeries and from the discriminatory treatment they are receiving vis-à-vis abortion providers. An injunction that prevents state officials from enforcing Executive Order 20-09 unless it is amended or clarified to restrict the use of PPE on elective surgical abortions will alleviate those injuries.

Finally, the churchgoer plaintiffs are suffering irreparable injuries because the governor's stay-at-home orders are depriving them of their constitutional right to attend church services, while state officials refuse to impose any social-distancing restrictions on an abortion patient's choice between surgical and medication abortion. The irreparable injury arises from the plaintiffs' current inability to attend in-person worship services, as well as from the discriminatory treatment that the plaintiffs are receiving from

the state's social-distancing orders. *See, e.g.*, Declaration of Rebecca Vavilov ¶ 7 (attached as Exhibit 13); Declaration of Angie Fuith ¶ 7 (attached as Exhibit 14). An injunction that prevents state officials from enforcing the stay-at-home orders unless they are amended or clarified to restrict the use of surgical abortions when medication abortion can be performed will alleviate those irreparable injuries.

III.  **Abortion Providers And Patients Will Suffer Little Or No Harm From A Preliminary Injunction That Prevents The Performance Of Surgical Abortion When Medication Abortion Is Available**

The proposed preliminary injunction will not prevent any patient who wants an abortion from obtaining one. It will merely require that abortion patients use medication abortion rather than surgical abortion when medication abortion is available. Although one might conceivably regard the lost ability to obtain one's preferred method of abortion as a "harm," that is but a small price to pay when the extra PPE that surgical abortions consume is needed to fight a deadly pandemic that has already killed 67,000 Americans—and is needed to protect the lives and safety of medical professionals who are providing essential health care during the pandemic. Abortion patients will also receive benefits from the proposed injunction because medication abortion is more consistent with social distancing. This will reduce the patient's risk of acquiring COVID-19 from their abortion, especially if they would otherwise obtain a surgical abortion from a physician who serves multiple abortion clinics and is at elevated risk of acquiring the virus on account of his travels.

More importantly, the proposed preliminary injunction should not harm abortion providers at all. The restrictions on surgical abortions will apply only when medication abortion could be performed on the patient instead, so abortion providers should not lose any business on account of the preliminary injunction. And abortion providers and their employees will benefit from the increased social distancing that the proposed

injunction will provide. Indeed, one of the defendant abortion clinics is "recommending" that its patients opt for medication abortion over surgical abortion because this method of abortion "can help keep you and our staff safer." *See* https://wehealth-clinic.org (last visited on May 3, 2020) (attached as Exhibit 7). An injunction requiring those patients to opt for medication abortion over surgical abortion cannot harm an abortion clinic that is already pleading with its patients to do so.

Finally, the preliminary injunction will not harm the state defendants. The state's officials have made clear that they wish to preserve PPE and encourage social distancing during the COVID-19 pandemic. The proposed injunction will accomplish exactly that, while still giving any woman who wants an abortion the ability to obtain one.

## IV. The Public Interest Strongly Supports The Proposed Preliminary Injunction

It is hard to imagine a public interest more urgent than the need to conserve PPE and enforce social distancing while our nation is in the midst of a deadly and catastrophic pandemic. The COIVD-19 outbreak has already killed over 67,000 Americans and sickened more than 1 million, and thousands more will get sick and die if the government fails to enforce social distancing to the maximum extent feasible. The defendants are jeopardizing the lives of their fellow citizens by allowing surgical abortions to continue when medication abortion could be used instead, and the public interest demands that this behavior stop immediately.

The public interest also requires that the government enforce its social-distancing measures and elective-surgery restrictions in an evenhanded manner. When state officials decide to exempt abortion providers from the state's COVID-19 prevention measures—and refuse to require them to take even the most minimal steps to conserve PPE and enforce social distancing—then citizens who are actually burdened by the State's COVID-19 prevention measures begin to question whether these restrictions

are really necessary. A robust and effective response to COVID-19 requires shared sacrifice, and continued public support for COVID-19 prevention measures depends on the perception that the burdens are being shared in a reasonably equitable fashion. When state officials give special allowances to politically favored groups such as abortion providers, they cannot credibly claim that the elective-surgery bans and social-distancing rules that they impose on everybody else are necessary health-and-safety measures.

## CONCLUSION

The motion for preliminary injunction should be granted.

Respectfully submitted.

/s/ Erick G. Kaardal

THOMAS BREJCHA*
Illinois Bar No. 0288446
MARTIN WHITTAKER*
Illinois Bar No. 6208211
Thomas More Society
309 West Washington Street, Suite 1250
Chicago, Illinois 60606
(312) 782-1680 (phone)
(312) 782-1887 (fax)
info@thomasmoresociety.org

ERICK G. KAARDAL
Minnesota Bar No. 0229647
Mohrman, Kaardal & Erickson, P.A.
150 South Fifth Street, Suite 3100
Minneapolis, Minnesota 55402
(612) 341-1074 (phone)
(612) 341-1076 (fax)
kaardal@mklaw.com

JONATHAN F. MITCHELL*
Texas Bar No. 24075463
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

* *pro hac vice* applications
   forthcoming

Dated: May 3, 2020

*Counsel for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with the word limits in Local 7.1(f) because it contains 5,713 words, as calculated by Microsoft Word for Mac version 16.30. I further certify that the word-count function was applied specifically to include all text, including headings, footnotes, and quotations.

I certify that this document complies with the type-size limit of Local Rule 7.1(h) because it was produced using the font ITC Galliard Pro in 13 point.

 /s/ Erick G. Kaardal
ERICK G. KAARDAL
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that I will hire a process server to deliver serve this document and all supporting exhibits, along with the complaint and summons, upon each of the defendants on Monday, May 4, 2020.

 /s/ Erick G. Kaardal 
ERICK G. KAARDAL
*Counsel for Plaintiffs*